# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JUWAN ANTOINE WICKWARE,

        Defendant-Appellant.

UNPUBLISHED
April 14, 2015

No. 318170
Genesee Circuit Court
LC No. 12-031147-FC

Before: M. J. KELLY, P.J., and WILDER and K. F. KELLY, JJ.

PER CURIAM.

On August 22, 2012, a jury convicted defendant of first-degree felony murder, MCL 750.316(b), armed robbery, MCL 750.529, conspiracy to commit armed robbery, MCL 750.157a and MCL 750.529, and possession of a firearm during the commission of a felony, MCL 750.227b, for his role in the killing of a pizza delivery man. [1] Defendant was 16 years old at the time of the offense. On August 20, 2013[2], defendant was sentenced to life imprisonment without the possibility of parole for the felony murder conviction, 200 to 450 months' imprisonment for the armed robbery and conspiracy to commit armed robbery convictions, and two years' imprisonment for the felony-firearm conviction. Defendant was later resentenced on the murder conviction, only, to a term of 30 to 60 years' imprisonment for the murder conviction. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

On April 7, 2010, Michael Nettles was murdered after attempting to deliver a pizza at 3424 Sterling. While on the porch at that address, an individual approached Nettles and demanded the pizza bag. Nettles tossed the bag to the individual and was attempting to get back into his Jeep when he was shot in the back. Nettles was shot multiple times but was able to drive away from the scene before crashing into a fire hydrant. An autopsy revealed that Nettles had been shot eight times.

---

[1] The jury declined to convict defendant of a first degree premeditated murder, MCL 750.316(a).

[2] The one-year delay was the result of preparation for a mitigation hearing.

-1-

Donqua Williams, John Williams[3], Quantageah Penegar, Antonio Clark and defendant were at 3420 Sterling on the night of the shooting. The testimony varied at trial, but ultimately a plan was made to order pizza and have it delivered to the house next door at 3424 Sterling. It was unclear whether the pizza had to be delivered next door because Little Caesar's had placed 3420 Sterling on a "do not deliver" list or whether it was delivered there because the plan from the inception was to rob the delivery man. In a statement to police, defendant admitted that he played a part in the events leading up to Nettles's death, although he denied taking part in a concerted plan to rob Nettles before his arrival. Defendant admitted that once Nettles arrived next door, defendant armed himself with a .22 caliber weapon and went outside. Defendant claimed that Donqua was armed with a .40 caliber weapon and was the primary shooter. Two bullets recovered from Nettles' body were .40 caliber. Defendant freely admitted that he confronted Nettles and also fired several rounds from his .22, albeit not directly at Nettles.

Donqua, John, Quantageah, Antonio and defendant were all charged with first-degree premeditated murder, first-degree felony murder, armed robbery, and conspiracy to commit armed robbery. Defendant and Donqua were tried together before separate juries. As part of a plea deal, Quantageah testified against defendant and Donqua. The trial court had previously dismissed charges against John, who was granted immunity and also testified against the men. Donqua was acquitted but defendant was found guilty of first-degree felony murder, armed robbery, conspiracy to commit armed robbery, and felony firearm.[4] On August 20, 2013, defendant was sentenced to life imprisonment without parole for the felony murder conviction, 200 to 450 months' imprisonment for the armed robbery and conspiracy to commit armed robbery convictions, and two years' imprisonment for the felony-firearm conviction.

Defendant filed a claim of appeal on September 12, 2013, raising issues unrelated to his sentence. Defendant filed a Standard 4 brief on April 28, 2014, in which he challenged his sentence of life without the possibility of parole. At the time of defendant's original sentence in August 2013, the United States Supreme Court had issued its decision in *Miller v Alabama,* 567 US ___; 132 S Ct 2455; 183 L Ed 2d 407 (2012), invalidating mandatory life terms without the possibility of parole for those under the age of 18 years, so the trial court had the benefit of the *Miller* decision when it originally sentenced defendant. However, on April 4, 2014, the prosecution moved this Court to remand the matter to the trial court so that it could reconsider defendant's sentence under recently adopted MCL 769.25, which allows trial courts to sentence offenders under the age of 18 convicted of murder to a term of years or, upon the prosecutor's request, a term of life without the possibility of parole.

This Court remanded the matter for resentencing. *People v Wickware*, unpublished order of the Court of Appeals, entered July 23, 2014 (Docket No. 318170). On September 29, 2014, defendant was sentenced to a term of 30 to 60 years' imprisonment for the murder conviction. Defendant initially appealed the resentence but then stipulated to a dismissal. *People v Wickware*, unpublished order of the

---

[3] It does not appear that the two were related.

[4] Antonio later pleaded guilty to second-degree murder and felony-firearm. This Court denied his delayed application for leave to appeal. *People v Clark*, unpublished order of the Court of Appeals, entered October 29, 2013 (Docket No. 316607), lv den 495 Mich 993 (2014).

Court of Appeals, entered December 9, 2014 (Docket Nos. 318170 and 324217). Therefore, the issues in defendant's Standard 4 Brief have been resolved.

## II. "ANONYMOUS JURY"

Defendant first argues that his right to trial by a fair and impartial jury was violated by the court's impaneling an anonymous jury. We disagree.

A trial court's decision to refer to jurors by numbers rather than names is a decision concerning the conduct of voir dire, which this Court reviews for abuse of discretion. *People v Williams*, 241 Mich App 519, 522; 616 NW2d 710 (2000). Defendant admits that he failed to object in the trial court; therefore the issue is reviewed for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

At the beginning of jury selection, the trial court advised:

At this time, I'm gonna have Cindy [the clerk] verify that those of you that are in the jury box are in your proper seats; and then, once we've done that, we'll begin the process of jury selection; and you may proceed, uh – and just so the lawyers know, we're just gonna use numbers here; we're not gonna mention any names. And we're gonna – Cindy's gonna be calling off the numbers to each – that correspond to the seat that they're in so you can write their numbers down if you want.

Defendant claims that the trial court violated his due process rights by impaneling an "anonymous jury," in that the jurors were referred to by number rather than name, and by failing to give an appropriate cautionary instruction explaining the anonymity.

An "anonymous jury" is one in which certain information is withheld from the parties, presumably for the safety of the jurors or to prevent harassment by the public. The withholding of information from parties was first used in federal courts, primarily as a protection against dangerous individuals. Use of this procedure in state courts began in the past decade. The courts have recognized that the use of an "anonymous jury" may promote the safety of prospective jurors, but at a potential expense to two interests of the defendant: (1) the defendant's interest in being able to conduct a meaningful examination of the jury and (2) the defendant's interest in maintaining the presumption of innocence. In order to successfully challenge the use of an "anonymous jury," the record must reflect that the parties have had information withheld from them, thus preventing meaningful voir dire, or that the presumption of innocence has been compromised. [*Williams*, 241 Mich App at 522-523 (internal citations omitted).]

However, simply referring to the jurors by number does not result in an "anonymous jury." Rather, an "anonymous jury" is "one in which certain information is withheld from the parties, presumably for the safety of the jurors or to prevent harassment by the public." *People v Hanks*, 276 Mich App 91, 93; 740 NW2d 530 (2007). The mere failure to read jurors' names into the record does not imply that information has been withheld from the parties.

Here, there was nothing to show that juror biographical information was withheld from defendant. The parties had access to the juror personal history questionnaires and a reasonable

opportunity to examine jurors before exercising challenges for cause or peremptory challenges. While conducting voir dire, defense counsel told the potential jurors:

> [T]hese questionnaires that you see us looking at, those are those things that you – that you completed – you know, we don't – nobody knows your – we don't even use your names any more. We used to, you know, up 'til about a year ago; and – and so that's not even done any more.

Defense counsel frequently referred to the questionnaires during voir dire. Although the potential jurors were referenced by number only, they were questioned regarding their occupation, marital status, and the occupation of any spouse if applicable. Additionally, the trial court allowed the attorneys to question the jurors regarding their work and life experience as well as their ability to set aside personal experiences and beliefs and follow the instructions provided by the trial court. In fact, meaningful voir dire clearly took place when the trial court exhausted the jury panel and had to resume jury selection the following day. Therefore, there is no evidence that the use of numbers prevented defendant "from conducting a meaningful voir dire or that his presumption of innocence was compromised." *Hanks*, 276 Mich App at 94.

Although this Court "strongly urge[s] trial courts to advise the venire that any use of numbers in lieu of jurors' names is simply for logistical purposes and they should not in any way consider it a negative against the defendant," *Id*., the suggestion falls short of a mandate. The trial court's mere use of juror numbers, standing alone, did not render the jury "anonymous" in this case.

## III. FAILURE TO DISMISS A JUROR

Defendant next argues that the trial court erred when it denied his request to have a juror removed on the tenth day of trial. We disagree.

"The trial court's decision whether to remove a juror is reviewed for an abuse of discretion. Constitutional issues, such as the right to a fair trial, are reviewed de novo." *People v Mahone*, 294 Mich App 208, 215; 816 NW2d 436 (2011), lv den 491 Mich 908 (2012) (internal citation omitted).

> [A]n abuse of discretion standard acknowledges that there will be circumstances in which there will be no single correct outcome; rather, there will be more than one reasonable and principled outcome. When the trial court selects one of these principled outcomes, the trial court has not abused its discretion and, thus, it is proper for the reviewing court to defer to the trial court's judgment. An abuse of discretion occurs, however, when the trial court chooses an outcome falling outside this principled range of outcomes. [*People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003) (internal citations omitted).]

At the close of the tenth day of trial, the court and the parties addressed concerns raised by one of the jurors. The juror had discovered a note buried in her notepad that read: "Dear 911, you will never know me. It's me, .22 cal killers. Let's play mind games." The trial court reassured the juror that the note was from a case that had been held five years earlier. The trial court admonished the juror that "it has nothing to do with anybody involved with this case or anyone trying to communicate with you in this case whatsoever" so "don't, in any way, assign this to anyone involved with this case because it had nothing to do with it."

The trial court also addressed the same juror's concern about a spectator possibly following her home:

> THE COURT: You had raised a concern, I think, as I understand it, about a young man that was seated in the back of the courtroom, I believe. I think I know who you're talking about because I saw him here also.
>
> UNIDENTIFIED JUROR: Um-hum.
>
> THE COURT: At this point, he has not been here today, so we don't really know who he is, in all honesty. But, from what, at least our discussions have been, we don't believe he's connected with anyone involved in this case directly other than just being a spectator. So, you don't have anything to worry about there, as far as we are aware.

Defense counsel questioned the jury about her concerns:

> MR. CLEMENT: . . . [W]hat happened, ma'am, if you could tell me?
>
> UNIDENTIFIED JUROR: With the gentleman that I seen in the courtroom?
>
> MR. CLEMENT: Yeah.
>
> UNIDENTIFIED JUROR: I was almost home yesterday and he was, like, a block within my house, so basically we were going the same route, but I never seen that truck in my neighborhood before. So – but before I could turn on, like two blocks over from my street, he – you know, he went off the other way.
>
> MR. CLEMENT: I mean, do you – do you believe that he was purposefully following you?
>
> UNIDENTIFIED JUROR: I don't really know, but I usually don't see anybody when I leave the courthouse.
>
> MR. CLEMENT: Okay. Let me – when – how did – how did you happen to know it was the same – I mean, you recog – remembered?
>
> UNIDENTIFIED JUROR: Yeah, because we were walking to lunch the day before, and he was sitting out – out in Saginaw Street in his truck and he was watching us. He was just sitting there.
>
> MR. CLEMENT: Watching us, as the jury, you mean?
>
> UNIDENTIFIED JUROR: The juries. The rest of us. We were walking to lunch. [Tr X, pp 147-148.]
>
> ***
>
> MR CLEMENT: Now, what was the first thing that came to your mind when you saw this person in your neighborhood?

-5-

UNIDENTIFIED JUROR: I kind of panicked, because I'm really kind of eerie (sic) about being a juror anyway, you know, and this is something I never done before, but the people that I see here in the courtroom, I do not see in my neighborhood.

MR. CLEMENT: Okay. And – and you panicked because?

UNIDENTIFIED JUROR: I thought he was following me home.

MR. CLEMENT: And for what purpose? What would you think? What came to your mind for what purpose might he have been doing that?

UNIDENTIFIED JUROR: Well, I – I don't know.

MR. CLEMENT: Did you think he might want to influence you in one way or the other in this – in this case? Did that come to your mind?

UNIDENTIFIED JUROR: Could be.

MR. CLEMENT: And who – which way did you think you would be – you know, what – in your mind, if somebody were to influence you in this trial, would it be toward a guilty verdict or a not guilty verdict?

UNIDENTIFIED JUROR: Not guilty.

MR. CLEMENT: Okay. So, you're concerned that maybe that person would've been somebody connected with Mr. Wickware in some way?

UNIDENTIFIED JUROR: Or anybody involved in the case.

MR. CLEMENT: Yeah, I thought you had indicated that if you thought you were going to be influenced, it would be influenced toward a not guilty verdict. Is that what I heard you say?

UNIDENTIFIED JUROR: Yeah, towards – as far as us coming to a verdict –

MR. CLEMENT: Right.

UNIDENTIFIED JUROR: -- then they would try to threaten me or convince me to go not guilty.

MR. CLEMENT: Okay.

UNIDENTIFIED JUROR: That's what I'm saying.

MR. CLEMENT: Okay. And . . . has that experience, the note and that, has that made you apprehensive, more apprehensive about this case, being a juror on this case?

UNIDENTIFIED JUROR: The incident that happened yesterday. The note, there is some more running around here too, so –

MR. CLEMENT:  What does that mean, some more running around here too?

UNIDENTIFIED JUROR:  I mean, there's other notes.  Other – other people said they had 'em too, so it's no big deal.  If they've used the tablets before in the courtroom, this is what I'm saying, they're –

MR. CLEMENT:  So, other jurors have said that they're running across other notes in their notebooks also?

UNIDENTIFIED JUROR:  Yeah.  So, they're all – all the pages are not being torn out or – or whatever.

MR. CLEMENT:  Okay.

UNIDENTIFIED JUROR:  Yeah.

MR. CLEMENT:  Well, with regard to the gentleman yesterday that you saw in your neighborhood, that's causing you to be apprehensive about remaining as a juror in this case, is that what you're saying?

UNIDENTIFIED JUROR:  Of course.

MR. CLEMENT:  Of course?

UNIDENTIFIED JUROR:  Um-hum.

MR. CLEMENT:  And do you think that that's going to influence your ability to – to look at the evidence the same as the day you started this trial?

UNIDENTIFIED JUROR:  No, I don't think it effect [sic] that.  It's just that I'm – you know, steady lookin' and watchin' now, for my safety.

MR. CLEMENT:  When you leave the – for your safety?

UNIDENTIFIED JUROR:  Um-hum.

MR. CLEMENT:  You're worried about your safety because of this now?

UNIDENTIFIED JUROR:  Yeah.

The juror had not discussed her concerns with the other jurors.

Defense counsel requested that the juror be excused because she "is apprehensive, and she's connecting that person who she's scared and apprehensive about to Mr. Wickware, my client."  Defense counsel believed that the note on the .22 caliber killers made the problem all the worse because defendant was alleged to have possessed and fired a .22 caliber gun.  The prosecutor suggested that the notes were unintentional and random.  He hoped that the spectator's presence in the juror's neighborhood was a mere coincidence and suggested that the jury be escorted to their vehicles to give them a sense of safety.

The trial court refused to dismiss the juror because the "juror was very clear that – that this would not have any effect on how she would decide this case. She was very clear on the fact that, you know, she's willing to accept that that note has nothing to do with this case." The trial court noted that the juror's apprehension came, not from the note, but from her fear of being followed:

> But, again, there's no indication that person is connected with Mr. Wickware or Mr. Williams in any way, shape or form. And she is not saying that they were connected. She certainly did indicate, based on your questioning, that she thought that if this person was trying to contact her, that this person was probably going to be asking her to say not guilty, which your inference from that is is that she's inferring that Mr. Wickware must be involved in it some way, shape or form. That might be an inference that one could come to, but in this juror's mind, I don't get the impression that she has concluded that that is the case. . . .Who would not be apprehensive if they see a person who they know was in the courtroom, someone who they saw sitting in a vehicle outside the courthouse, and then that person is in their neighborhood when they normally don't see him in the neighborhood. That is what she said. So, she said that because of that, she's going to be much more aware of her surroundings. That is, in my opinion, a natural response that a human being would have, if that's what they're thinking. But, there's nothing she said that would indicate to me that she intends to use this note or the fact that this person followed her in deciding the guilt or innocence of Mr. Wickware. And so, for that reason, I would deny your motion to have her removed because I don't think that in any way, shape or form this juror intends to make that decision based on that.[5]

Defendant argues that the juror should have been removed. Defendant had a constitutional right to a fair and impartial jury. US Const, Am VI; Const 1963, art 1, § 20; *People v Miller*, 482 Mich 540, 547; 759 NW2d 850 (2008). On appeal, defendant cites MCR 2.511(D)(2) and (3), which provide:

> The parties may challenge jurors for cause, and the court shall rule on each challenge. A juror challenged for cause may be directed to answer questions pertinent to the inquiry. It is grounds for a challenge for cause that the person:
>
> ***
>
> (2) is biased for or against a party or attorney;
>
> (3) shows a state of mind that will prevent the person from rendering a just verdict, or has formed a positive opinion on the facts of the case or on what the outcome should be;

---

[5] The trial court noted that it was often hard to find black jurors because they were "more easily able to be found in the [tight knit] community" and "because they know that they're easily identified. They're easily followed." The trial court has seen cases where individuals take advantage of that and try to intimidate jurors and witnesses. For that reason, the trial court believed it was wise to have the jurors escorted to their cars over counsels' objection.

MCR 6.412(D)(2) provides that if "the court finds that a ground for challenging a juror for cause is present, the court on its own initiative should, or on motion of either party must, excuse the juror from the panel." However, jurors are presumed to be impartial and defendant bore the burden of establishing "that the juror was not impartial or at least that the juror's impartiality was in reasonable doubt." *Miller*, 482 Mich at 550.

The trial court did not abuse its discretion when it denied defendant's request to remove the juror. There was no evidence that defendant was deprived of a fair and impartial trial. The juror was forthcoming and voluntarily disclosed her concerns about the notes and about the individual in her neighborhood. The trial court and the attorneys questioned the juror outside the presence of the other jurors. Her fears about the notes were quickly dispelled once the trial court and the prosecutors explained that the notes were related to another case. The juror also explained that, although she would now be more careful, she did not hold anything against defendant and would be able to decide the case fairly. "'[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation.'" *People v Grove,* 455 Mich 439, 472, 475–476; 566 NW2d 547 (1997), superseded by statute on other grounds as stated in *People v Franklin,* 491 Mich 916 (2012), quoting *Smith v Phillips*, 455 US 209, 217, 102 S Ct 940, 71 L Ed 2d 78 (1982). Instead, "'[d]ue process means a jury capable and willing to decide the case solely on the evidence before it . . ..'" *Grove*, 455 Mich at 472, quoting *Smith*, 455 US at 217. The trial court concluded that the juror's ability to be fair and impartial was not impaired. Given the record, it cannot be said that the trial court abused its discretion.

## IV. PROSECUTORIAL ERROR

Finally, defendant argues that the prosecutor impermissibly appealed to the jury's sympathy during rebuttal arguments. We disagree.

Our Court has recently held:

> [W]e must look to see whether the prosecutor committed errors during the course of trial that deprived defendant of a fair and impartial trial. Where a defendant fails to object to an alleged prosecutorial impropriety, the issue is reviewed for plain error. A plain error is one that is clear or obvious, and the error must affect the defendant's substantial rights. That is, the defendant must have been prejudiced by the plain error. Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of defendant's innocence. [*People v Cooper*, ___ Mich App ___; ___ NW2d ___ (Docket No. 318159, issued January 22, 2015), slip op, p 8 (internal quotation marks and citations omitted).]

A defendant is not denied a fair and impartial trial if a timely objection and curative instruction could have alleviated the prejudicial effect of an improper comment. *People v Unger*, 278 Mich App 210, 241; 749 NW2d 272 (2008).

During rebuttal, the prosecutor argued:

> This is the receipt from the day in question from the order that was to be delivered to 3420 Sterling. Two large Strombolis, $19.98; one medium pizza, $8.81; one side order of garlic butter and side of parmesan, $2.00, for a grand total of $37.14. The order on the

day in question was $37.14. Michael Joseph Nettles' life is priceless. That's why when you deliberate, the People request that you find the defendant guilty of first degree murder, guilty of felony murder, guilty of armed robbery, guilty of conspiracy to commit armed robbery, and guilty of felony firearm.

"Issues of prosecutorial misconduct are reviewed on a case-by-case basis by examining the record and evaluating the remarks in context." *People v Mann*, 288 Mich App 114, 119; 792 NW2d 53 (2010). "The propriety of a prosecutor's remarks depends on all the facts of the case. Prosecutorial comments must be read as a whole and evaluated in light of defense arguments and the relationship they bear to the evidence admitted at trial." *People v Rodriguez,* 251 Mich App 10, 30; 650 NW2d 96 (2002) (internal citation omitted). "A prosecutor may not make a statement of fact to the jury that is not supported by evidence presented at trial and may not argue the effect of testimony that was not entered into evidence." *Unger*, 278 Mich App at 241. Nor may a prosecutor "appeal to the jury to sympathize with the victim." *Id.* at 237.

The prosecutor's statement was not improper. In referencing the receipt, the prosecutor commented on the senselessness of the crime. Such a characterization was consistent with the evidence. The prosecutor was not asking the jury to convict defendant out of sympathy for the victim. Additionally, the trial court instructed the jury that they could not let sympathy dictate their verdict and further admonished that the lawyers' statements and arguments are not evidence. Jurors are presumed to follow their instructions. *Unger*, 278 Mich App at 235.

Affirmed.

/s/ Michael J. Kelly
/s/ Kurtis T. Wilder
/s/ Kirsten Frank Kelly

-10-